Chief Judge Kaye
(dissenting). After a jury trial, defendant was convicted of intentional murder in connection with a shooting on a Brooklyn street corner in 1992. Evidence at trial showed that there was a dispute between two groups of men, ages 15 to 25, about which was going to use that particular corner for selling drugs. After a fistfight broke out between one member of each group, one of the combatants was shot and killed in a hail of bullets as everyone scattered. According to the People, defendant was the sole shooter.
In October 1997, three weeks after defendant’s arraignment and almost a year before trial, defense counsel sent a fax to the prosecutor specifically requesting copies of any ballistics reports. That same day defense counsel made an omnibus motion, incorporating his demand to produce, which requested “[a]ny written report” concerning a “scientific test.” In response, the People stated that “[discovery will be produced prior to opening statements.”
Trial began in September 1998. From Day One, defense counsel began cultivating the theory that more than a single gun and a single assailant were involved in the crime. Cross-examined by defense counsel, the Medical Examiner testified that the victim’s wounds indicated that he had been shot from three different directions, and that the wounds “could [have] come * * * from similar but just different guns.” Defense counsel also elicited the following admissions from a Crime Scene Unit detective:
“[Defense counsel]: You aren’t able to say, are you, Detective, how many guns from which [the] shells were discharged, isn’t that true?
*286 “[Detective]: That’s true.
“[Defense counsel]: You are not able to say the number of perpetrators who fired those guns from the shells you recovered, correct?
“[Detective]: That’s correct.
“[Defense counsel]: You aren’t able to say whether or not the shells were discharged from more than one gun, correct?
“[Detective]: That’s correct.”
The detective acknowledged that the casings could have come from a nine-millimeter or a .380 caliber weapon, and from automatic or semiautomatic weapons. Defense counsel’s questioning then underscored the probative value — and absence — of a ballistics report:
“[Defense counsel]: It is possible, is it not, Detective, to take discharged shells and do a microscopic comparison of those shells to see whether or not they were fired from the same gun, isn’t that true?
“[Detective]: That is true. * * *
“[Defense counsel]: If [the shells] are similar, the conclusion might be that they came from the same gun, correct?
“[Detective]: Correct.
“[Defense counsel]: If they are dissimilar, the conclusion might be that they came from one or more guns that were different, correct?
“[Detective]: That’s correct.
“[Defense counsel]: Do you know whether a microscopic comparison of discharged shells was done in this case?
“[Detective]: I don’t know.
“[Defense counsel]: And you have no report with respect to that?
“[Detective]: No.”
Two days later, after three witness had testified, defense counsel notified the Trial Judge that there was a ballistics expert listed on the People’s witness list, though he had never *287 received a ballistics report. The prosecutor responded that they had already produced the report and would bring over another copy from the office. The prosecutor explained that two thick files had been turned over to defense counsel “before the trial began with all the Rosario in it.”
The following day — the fourth day of trial, after four more witnesses had testified — a copy of a ballistics report surfaced, revealing to defense counsel for the first time the determination that all 20 shell casings had been fired from one gun. Defense counsel requested preclusion of any testimony regarding the report, noting that he had requested ballistics tests in his omnibus motion and on numerous occasions in the months following the indictment but had never received it. The prosecutor maintained that the report had been turned over two weeks earlier as part of two four-inch-thick manila envelopes of documents.
Whether the report was indeed made available earlier— which defendant denies — is a question that remains unresolved. The Trial Judge, affirmed by a majority at the Appellate Division and now by this Court, has determined that, even if the report was not produced until the fourth day of trial, defendant suffered no prejudice. I cannot agree. Late production of the ballistics report undermined counsel’s trial theory and substantially discredited the defense. I would reverse and remit to the trial court to determine the open question regarding production of the ballistics report.
After the Trial Judge denied defense counsel’s request to preclude testimony regarding the report, the Ballistics Unit detective took the stand and testified that “without a doubt” the 20 shell casings “definitely” came from one gun “to the exclusion of any other gun.” He further testified that the bullet recovered from the body came from the same caliber gun as the 20 casings, and that the bullet fragment recovered at the scene had very similar characteristics to the bullet recovered from the body. The ballistics evidence, then, established that the 20 casings were from one gun, and that the recovered bullet and fragment most likely also came from that same gun.
As defense counsel argued, “[i]f I had had this [report] and [it] had said 20 bullets came from one gun, I would not have asked those [earlier] questions, because clearly [the report] is a smoking gun * * * I shouldn’t be penalized by not having material I need to properly prepare my case.” Simply put, defendant was blind sided, midtrial, by scientific proof undermining *288 his defense. As we have stated: “The criminal discovery procedure embodied in [CPL] article 240 * * * evinces a legislative determination that the trial of a criminal charge should not be a sporting event where each side remains ignorant of facts in the hands of the adversary until events unfold at trial” (People v Copicotto, 50 NY2d 222, 226 [1980]).
The majority’s statement that the defense attorney knew a ballistics report existed but was not disclosed and thus, in effect, proceeded to question witnesses at his own risk (majority op at 284) misses the point. Defendant specifically requested the report at least twice and did not receive it. He is not required to ask repeatedly for the People to comply with discovery requirements or else assume the risk that the People have crucial evidence that has not been produced. And that counsel continued to pursue the multiple-shooter defense does not indicate a lack of prejudice to the defendant’s case — he may have understandably felt it was simply too late to change course. As Justice Goldstein aptly noted below, “the fact that the defendant was still able to pursue a defense that' was significantly weakened and ultimately unsuccessful does not diminish the fact that the defendant suffered significant prejudice” (People v Jenkins, 284 AD2d 550, 552 [Goldstein, J., dissenting] [internal quotation marks omitted]).
Finally, repeated specific requests, an alleged turnover of hundreds of pages of unidentified, undifferentiated material in two thick envelopes, and then the appearance of ballistics reports on the fourth day of trial, was no way for the People to discharge their serious obligation to turn over documents. I see no excuse for failing to make timely document production, without burdening the parties or the courts with the need for orders. And I see no excuse for failing to create some sort of readily verifiable record of what has been turned over, by simple measures like numbering pages and listing documents. What is at stake is simply too important for anything less.
Judges Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur with Judge Smith; Chief Judge Kaye dissents and votes to reverse in a separate opinion.
Order affirmed.